FILED

03/19/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2024

## CARL FRANKLIN PENDERGRAST v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bedford County
Nos. 19214, 19217, 19261  Forest A. Durard, Jr., Judge**

_____

### No. M2023-00057-CCA-R3-PC

_____

Petitioner, Carl Franklin Pendergrast, appeals the Bedford County Circuit Court's denial of post-conviction relief from his guilty-pleaded convictions for four counts of sale of methamphetamine less than .5 grams, two counts of sale of hydrocodone, one count of sale of cocaine less than .5 grams, and one count of conspiracy to deliver methamphetamine less than .5 grams, for which he received a total effective sentence of twenty-six years' incarceration. Petitioner contends that he is entitled to post-conviction relief because his guilty pleas were the product of coercion and, therefore, not voluntarily entered. Following a thorough review, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Taylor D. Payne, Murfreesboro, Tennessee, for the appellant, Carl Franklin Pendergrast.

Jonathan Skrmetti, Attorney General and Reporter; Christian N. Clase, Assistant Attorney General; Robert J. Carter, District Attorney General; and Michael Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural Background

#### Plea submission hearing

At the guilty plea submission hearing, the State summarized the factual basis for Petitioner's convictions. As to Case No. 19214, the State announced:

Count 1 . . . occurred on July 30, 2019. On that date[,] the agents of the Drug Task Force met with a confidential informant [CI] about purchasing drugs from [Petitioner]. The confidential informant called [Petitioner] and they setup a time and place to meet and conduct the transaction. This occurred, this was going to involve the confidential informant going to the residence where [Petitioner] lived at the time. The confidential informant was searched and the vehicle was searched and that had a negative result. The confidential informant was then provided $100 to purchase methamphetamine from [Petitioner], and was followed to the residence, observed going to the residence and ultimately going to the shed, I believe it is in the backyard or behind the house. And the confidential informant met with [Petitioner] and handed the $100 to [Petitioner] and received methamphetamine in return. The confidential informant then departed and returned the meth to the agents that were in a position of observation. That was sent to the lab and weighed .93 grams and it was methamphetamine.

. . . .

Count 3 occurred on October 16, 2019. On this occasion[,] the confidential informant was going to go again to [Petitioner's] residence. The confidential informant owed $80 to [Petitioner] I believe for a previous drug transaction and the confidential informant was going to attempt to purchase additional drugs from [Petitioner]. So $160 was provided to the confidential informant, the confidential informant was searched, and the vehicle was searched and then followed to the same residence.

Again[,] met with [Petitioner] at the shed, at or around the shed, paid the $80 for the prior transaction and paid $80 to [Petitioner] and in exchange received [eight] Hydrocodone pills. The confidential informant then left to return those to the Drug Task Force agents. They sent the pills to the lab and indeed they were Hydrocodone, a Schedule II drug.

. . . .

. . . [B]oth occurred on October 17, 2019, that is Count 5 and 7. On this occasion . . . the confidential informant met with the agents of the Drug Task Force. And the plan was essentially to purchase whatever drug that [Petitioner] might have at the time. He was known as a potential seller of more than one type. And so the confidential informant met with the agents of the Drug Task Force. They provided $100 in prerecorded funds. The vehicle was searched, the confidential informant was searched, but that led

to negative results. The confidential informant then went to the same residence, again went around back to the shed. Ultimately[,] I think met with [Petitioner] in and around the shed, provided $100 to [Petitioner]. [Petitioner] handed over a white powder which looked like cocaine and also [five] pills and was paid the $100. The confidential informant then left and met back with agents of the Drug Task Force.

The substances were sent to the lab, the white powder tested positive for Cocaine, a Schedule II drug weighing .45 grams and the pills tested positive to be hydrocodone, also a Schedule II drug.

Regarding Case No. 19217, the State recounted that, on February 19, 2019:

[M]embers of the police department began monitoring telephone calls involving [Petitioner], who was an inmate at the Bedford County Jail, and those phone calls were between Tonya Pendergrast[1] and on occasion Makayla Pendergrast would also be on the phone. And the substance of the conversation was about getting or smuggling some items into the jail, which included meth[amphetamine] and some discussion about marijuana, but [Petitioner] said he thought that would be ["]quite too loud["] which I believe means that there is some likelihood that might be detected by a corrections officer if marijuana was used in the jail.

The conversations continued on February 20, 2019[,] and also there were some e-mails between [Petitioner] and Makayla Pendergrast about the subject and there was talk about an individual named John Qualls who was also an inmate and he was on either work release or trustee status where he would go to the agricultural center and work there. So the discussion was to have the items put in say something like a pill bottle and wrapped in some sort of material like black tape or something like that to make it waterproof and to leave that there. And that John Qualls, who was sometimes in some of these communications and was referred to as JQ, could pick it up, bring it back to the jail and get it delivered to [Petitioner], the inmate.

There were further communications on the 21st, again e-mails between these defendants about the subject of getting the package delivered. And I believe there was one specifically about getting it done for tomorrow.

[1] We note that, throughout the transcript of the guilty plea submission hearing, Petitioner's last name is mistakenly spelled "Pendegrast." We have corrected the spelling while quoting from the transcript to avoid confusion.

On the morning of February 22nd the police read an e-mail from Makayla to [Petitioner] that the delivery had been accomplished.

So[,] the police department contacted a member of the Sheriff's Department who went to the [agricultural] center and they indeed located a package that appeared to be a pill bottle wrapped in black tape and inside there were matches, rolling paper, tobacco, [two] Alprazolam tablets, some Gabapentin . . . capsules and also I believe there was a white powder which field tested and ultimately tested positive to be methamphetamine.

So[,] the police department then interviewed the various individuals. They did interview Makayla, she said she did not have anything to do with it but in her interview basically implied that she was aware of the conversation, what was going on, but she was not involved in it.

The police department also interviewed Tonya Pendergrast, who was [Petitioner's wife] and Makayla's mother, and she initially denied any involvement but ultimately said yes, there were all of these conversations and that it was Makayla that was supposed to make all of the arrangements to get the drugs and see to it that they got delivered. I think Makayla did say she knew some people that were involved in making the delivery[,] but she was not personally involved. I will tell the Court Mrs. Pendergrast has passed away subsequent to all of these events.

The police department . . . went to the residence where Mrs. Pendergrast was staying at the time. There was a search, there were no additional drugs found but in a room they believe was occupied by Makayla they found [three] additional medicine bottles also wrapped in duct tape. That is it for those [two] cases.

Finally, the State summarized the facts in Case No. 19261, as follows:

So now we have Case No. 19261, this is the criminal information, . . . so these would be the cases that occurred while [Petitioner] was on bond from these other charges.

So Count 1 occurred on November 24, 2020. On that occasion the confidential informant met with agents of the Drug Task Force and indicated that the confidential informant could purchase meth[amphetamine] from [Petitioner] and was provided $100 with which to make a purchase. The

- 4 -

confidential informant was searched, the vehicle was searched and met with a negative result.

The CI then proceeded to the Shell gas station and met with [Petitioner]. I believe . . . the CI approached [Petitioner's] vehicle and they conducted the transaction I think through the window. The CI handed the money to [Petitioner]. [Petitioner] then handed a quantity of meth[amphetamine] to the CI, they parted company and the CI met back with agents of the Drug Task Force that had been observing these events. They handed the drugs over. We do not have the lab report yet but you will see for the purposes of negotiation we have treated these as less than half a gram, but all indications to the officers were that the substance appeared to be methamphetamine based on their experience and training.

. . . .

Count Two occurred on November 30, 2020. On this occasion the confidential informant again met with agents of the Drug Task Force and was searched, the vehicle was searched and was provided $100 in which to make the transaction for meth[amphetamine]. The search met with negative results. The CI then proceeded to a residence here in Bedford County. I believe on this occasion when the CI arrived at the residence and under the observation of the agents of the Drug Task Force, [Petitioner] came out to the CI's vehicle[,] and the CI handed money to [Petitioner]. I think there was a short delay and then another individual arrived or entered the picture and had the meth[amphetamine] and then that was handed to the CI to complete the transaction.

And then of course the CI left and returned that to the agents of the Drug Task Force. And I believe it has been sent to the lab, we don't have the lab report yet, but based on their training and experience it appeared to be methamphetamine. And I will say much like in the Count 1 situation it actually appeared to be approximately a gram of meth[amphetamine], but we don't have an actual lab weight. And so in this case again it appears to be approximately a gram of meth[amphetamine] but we don't have a lab report so for purposes of negotiation[,] we treated it as less than half a gram.

. . . .

And finally Count 3, very similar to Count 2, the CI met with agents of the Drug Task Force, this time it was to purchase meth[amphetamine] or

any other drug that was available. The CI was searched, the vehicle was searched and was met with negative results. The CI was provided $160 with which to make a purchase. The CI proceeded to the same residence that was involved in the Count 2 transaction. The CI met with [Petitioner], handed over the money and received drugs in exchange. There was a crystalline substance which appeared to be methamphetamine. There were also five pills which appeared to be Hydrocodone. The . . . meth[amphetamine] appeared to be approximately a gram, may have been a little less, but again we don't have the lab results and we are treating that as less than one half a gram.

Prior to accepting Petitioner's guilty pleas, the trial court ensured that Petitioner understood his constitutional right to have the offenses in Case No. 19261 presented to the Bedford County Grand Jury, and Petitioner acknowledged that he was waiving that right "voluntarily." The trial court found that Petitioner was competent, that he was "fully informed[,]" and that he was "voluntarily and knowingly and intelligently waiving his right to the Grand Jury." Upon questioning by the court, Petitioner denied having any health problems and denied being under the influence of "any drugs or alcohol or other medications." Petitioner stated that he had a GED, that he could read and write, and that he had signed the plea paperwork. The trial court reviewed Petitioner's charges, the elements of each offense, and the possible punishments for each offense. The court then reviewed the plea agreement, and Petitioner said that he understood. Petitioner agreed that he had discussed the facts of the cases with counsel. After the State announced the factual basis for each guilty plea, the trial court asked Petitioner if the factual summary was accurate, and Petitioner responded affirmatively. Petitioner admitted that he was guilty of the offenses. The trial court reviewed Petitioner's constitutional rights and ensured that Petitioner understood he was waiving those rights by entering his guilty pleas.

The following colloquy then occurred between the trial court and Petitioner:

Q. Anybody making you plead guilty here today?

A. No, sir.

Q. Anybody threaten you to make you plead guilty?

A. No, sir.

Q. Has anybody promised you anything to make you plead guilty that we have not talked about?

- 6 -

A. No, sir.

Q. So as far as you are concerned you know you are entering a plea of guilty and you are voluntarily entering that plea; is that accurate?

A. Yes, sir.

Q. Any problems talking to your lawyer about the case?

A. No.

Q. Got any complaints about the way the matter has been handled?

A. No, sir.

The trial court found that Petitioner was competent to enter his guilty pleas and that he was doing so "knowing the direct and indirect consequences[.]" Additionally, the court found that the pleas were "entered knowingly, voluntarily, [and] intelligently" and that there was a factual basis for the guilty pleas.

Pursuant to Petitioner's plea agreement, the trial court imposed the following sentences:

| Case No. | Count | Offense | Range | Sentence |
|---|---|---|---|---|
| 19214 | 1 | Sale of methamphetamine less than .5 grams | II | 18 years at 35% |
| 19214 | 3 | Sale of hydrocodone | I | 6 years at 30% |
| 19214 | 5 | Sale of cocaine less than .5 grams | I | 6 years at 30% |
| 19214 | 7 | Sale of hydrocodone | I | 6 years at 30% |
| 19217 | 1 | Conspiracy to deliver methamphetamine less than .5 grams | I | 4 years at 30% |
| 19261 | 1 | Sale of methamphetamine less than .5 grams | I | 4 years at 30% |
| 19261 | 2 | Sale of methamphetamine less than .5 grams | I | 4 years at 30% |
| 19261 | 3 | Sale of methamphetamine less than .5 grams | I | 4 years at 30% |

The court ordered all counts in Case No. 19214 to run concurrently and ordered the sentence in Case No. 19217 to run concurrently with Case No. 19214. In Case No. 19261, the court ordered Counts 2 and 3 to run concurrently with one another but consecutively to Count 1. Finally, the court ordered Case No. 19261 to run consecutively to Case Nos. 19214 and 19217, for a total effective sentence of twenty-six years' incarceration—eighteen years with a thirty-five percent release eligibility and eight years with a thirty percent release eligibility.

### *Post-conviction proceedings*

Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, an amended petition was filed. At an evidentiary hearing, circuit court trial counsel ("circuit court counsel") testified that he was originally appointed to represent Petitioner on charges in general sessions court but that the charges were bound over after a preliminary hearing. He explained that one of Petitioner's charges was a conspiracy charge that involved Petitioner's daughter and wife,[2] who were charged as co-defendants. He said that he was reappointed to represent Petitioner on the charges in circuit court.

Circuit court counsel testified that, after Petitioner's arraignment, he obtained discovery from the State. He said that he met with Petitioner four or five times. He explained that Petitioner was originally out on bond but that Petitioner was arrested on new charges, resulting in the revocation of his bond. Regarding the evidence against Petitioner, circuit court counsel stated:

> [T]he three sales as well as the introduction of contraband, there was an audiotape on introduction of contraband where [Petitioner] -- and his voice is very distinctive. It's obviously him. He's speaking with -- I want to say it was his daughter. I'm not 100 percent sure. But he's upset because the items were not where they were supposed to be. Apparently[,] there was a conspiracy for her to throw some items over a fence near a red barn across from the [agricultural] center and someone on a work crew went to try to find it and they couldn't. And so he's talking to her from the jail about the contents of it and says, you know, he didn't need any green. . . . But, you know, he basically said all you got to do is toss it over there. She was worried about someone else getting it. He wanted it done tonight. I'm guessing the work crew was probably going to change spots. So, you know, there was that evidence.

---

[2] Circuit court counsel stated that Petitioner's wife passed away while the matter was pending in general sessions court.

Circuit court counsel noted that the State also had Petitioner under surveillance on the occasions in which Petitioner sold methamphetamine to a CI. Circuit court counsel testified regarding one sale:

> The CI's name was Shane and I remember -- I have listened to a lot of audiotapes from CIs but you could hear [Petitioner's] pouring the methamphetamine onto the scale. You could hear the -- I have never heard that clear of audio. It was so clear and . . . he's saying, "Oh, that right there is fire." . . . You know, when they've got you, they've got you in spades. You know, there's usually buy money. There's usually meeting with the CI prior to the sale. They've got them under video surveillance and audio surveillance. And then they count the buy money afterwards and it's all marked. So[,] they had him.

Circuit court counsel stated that he discussed with Petitioner the evidence against him. He testified that Petitioner was on bond for "[t]he contraband, the conspiracy, as well as three other sales that occurred on July 30th, October 16th, and October 17th" when Petitioner was arrested on new charges. Circuit court counsel said that he then discussed with the prosecutor the possibility of bringing the new charges to circuit court by way of criminal information "so that we [could] just do a package deal on all of it." Regarding the new charges, circuit court counsel said:

> It's clear to me all the allegations in those three sales are over half a gram. So, you know, he's looking at 12 to 20 [years]. He's already Range [II] on the B [felony] that I'm representing him on then because of the A felony and these are committed while out on bond, mandatory consecutive 12 to 20 [years].

Circuit court counsel said that he obtained a plea offer from the State, which he discussed with Petitioner. He said that Petitioner was concerned about his daughter, who was "young and clearly . . . addicted to methamphetamine." He testified that counsel for Petitioner's daughter "had gotten her . . . a very favorable deal" but that the State's offer was contingent upon Petitioner's accepting his plea offer. Circuit court counsel said that he and counsel for Petitioner's daughter communicated the State's "package deal" to their clients. He explained that, although Petitioner was concerned about his daughter, that "wasn't the sole motivation" for his accepting the State's offer. Circuit court counsel stated, "The sole motivation was the fact that he had three Class B, which he's at least Range [II] on, felonies that were mandatory consecutive to one another and what his current sentence was and the fact that he was getting eight years on that."

On cross-examination, circuit court counsel testified that he had been practicing law for eighteen years. He said that he received an initial plea offer from the State in November 2020 but that Petitioner was arrested on the new charges in December 2020. He said that he had discussions with Petitioner about the strengths and weaknesses of the State's cases against him. He said that he discussed with Petitioner his options in resolving the charges, including that Petitioner could "negotiate or . . . just plead open or . . . go to trial[.]" He averred that Petitioner "freely entered into that plea and he did so knowing . . . what his options were and knowing the strengths and weaknesses of the [S]tate's case[.]" He said that he never had problems communicating with Petitioner. During questioning by the post-conviction court, the following colloquy occurred:

> THE COURT: So for all of this it sounds like [Petitioner] got very close to the minimum.
>
> [CIRCUIT COURT COUNSEL]: Twenty-six years. Yes, Your Honor.
>
> THE COURT: Would you agree or disagree with that?
>
> [CIRCUIT COURT COUNSEL]: I would agree he got less than minimum because the -- well, presuming that the allegations in the original warrants were true and that these sales were over half a gram, then he got less than the minimum because the [State] offered him eight [years] which is four less than the minimum.

General sessions trial counsel ("general sessions counsel") testified that, in January 2021, he was retained to represent Petitioner in general sessions court, where Petitioner was charged with three counts of sale of methamphetamine over .5 grams, two counts of "education neglect," one count of conspiracy to deliver methamphetamine over .5 grams, and one count of felon in possession of a firearm. General sessions counsel explained that Petitioner was out on bond when he committed the offenses and that Petitioner was charged along with his twenty-one-year-old daughter. He explained that he had been in the practice of law for fifty years.

General sessions counsel stated either he or his investigator met with Petitioner; he said that, in discussions with Petitioner, Petitioner said he became addicted to methamphetamine in 2018, and within six months, Petitioner was using 1.5 to 2.0 grams of methamphetamine per day at $150 to $200 cost. Petitioner told general sessions counsel that he began selling small quantities of methamphetamine to support his drug habit. Petitioner said that he "only sold to close friends and never more than one gram at a time" and that he had "no idea who the CI [was] in the pending cases." General sessions counsel

stated that he met with Petitioner one other time but noted that he only represented him in general sessions court and that, once Petitioner was indicted, circuit court counsel took over the representation on all charges.

General sessions counsel recalled that he spoke to Petitioner by phone before Petitioner entered his guilty pleas in circuit court; he testified, however, that he was not involved in the plea negotiations. Regarding the plea agreement, general sessions counsel said that he believed Petitioner "fell on the sword for his daughter" because his daughter's favorable plea deal was contingent upon Petitioner's accepting his plea offer. General sessions counsel said that he did not suggest to Petitioner that Petitioner accept the State's offer. General sessions counsel testified that he thought Petitioner "was given a pretty good deal . . . considering what his ranges were at that time" and that, if Petitioner was successful in obtaining post-conviction relief, Petitioner had "a real serious problem . . . in front of a jury and sentencing thereafter." General sessions counsel said that, ultimately, the charges he represented Petitioner on in general sessions court were brought up to circuit court by criminal information and resolved as part of Petitioner's plea agreement.

General sessions counsel agreed that Petitioner had a prior conviction for second degree murder, a Class A felony. He further agreed that because of the prior conviction, Petitioner was potentially a Range II offender as to his charges of Class B felony sale of methamphetamine over .5 grams. General sessions counsel stated, "I think that was our biggest concern because of that A felony and when [Petitioner] was talking about it . . . what he was looking at was going to be pretty serious and that's why we did it by information[.]" General sessions counsel testified that, based upon his communications with Petitioner, he thought Petitioner was "highly intelligent[.]"

Petitioner testified that he did not "really have any communication with counsel prior to entering [his] plea[.]" He denied ever meeting with general sessions counsel but said that he met with counsel's private investigator one time when the investigator visited him in jail. He explained that his sister retained general sessions counsel to represent him because he was incarcerated at the time. Petitioner said that he met with circuit court counsel four times. He testified that he did not review discovery with circuit court counsel, stating that he was only shown pictures of the $20.00 bills used as "buy money." Petitioner stated:

> [Circuit court counsel] c[a]me once to the jail and showed me some papers and said he had a CD with my voice on it and asked me did we have any way of listening to it in the back and I said, No, we don't have CDs. And he never asked the staff or the jail administrator for me to hear it. So[,] I have no idea. It could have been Bon Jovi on the CD as far as I know.

- 11 -

Petitioner stated that, after he was arrested on the new charges, circuit court counsel called general sessions counsel and talked to him for "five to ten minutes." Petitioner said that he then spoke to general sessions counsel, who told Petitioner, "I think you ought to plead out. And that was the whole conversation." Regarding what led up to his accepting the State's offer, Petitioner testified:

[Circuit court counsel] had come that morning and told me that the [S]tate was offering [twenty-two] years. And I told him to see if he talked to [the prosecutor] . . . to see if he could get him to come down. He said, I will talk to him over lunch. Well, he come back after lunch and pulled me back out of the holding cell and . . . my daughter's attorney, pulled her out. So we were all four standing there and [daughter's counsel] told my daughter . . . the DA is going to offer you a sweetheart deal, four years of community corrections, one year in rehab, and [ninety] days to serve, but they will only do it if [Petitioner] takes his plea. And [circuit court counsel] looked and said, [m]y client is going to have to fall on the sword. He's going to have to accept his [twenty-six] years . . . And I asked him then, I said, Well, why are they doing that? I said, [c]an't she just take her plea? And he said, [n]o, they won't let her take her plea unless you take yours.

Petitioner said that he accepted the State's offer because, "I figured -- I mean, I'm not going to be the daddy that sends my daughter to prison. I mean, that's not who I am." Petitioner maintained that, if his daughter had not been "pleading out" the same day, he would have taken his cases to trial. He stated, "I was planning on going to trial and everything. I was going to make them prove it." He said that he told circuit court counsel that he wanted a trial but that counsel never discussed possible defenses with him. The following exchange then occurred:

Q. Now, you entered a guilty plea to these charges though; correct?

A. Yes, I did.

Q. And the judge would have asked you several questions about your understanding of the plea?

A. Yes.

Q. Okay. And you answered all of those that you did understand it. Is it fair to say that the reason you answered those questions like you did is because you wanted to resolve this case for your daughter?

A.    Yes.    I mean, my daughter answered negative to one of the questions during the plea proceeding and the proceeding was stopped until she spoke with her lawyer and then she come back and answered affirmative and the plea proceeding went on.

On cross-examination, Petitioner acknowledged that he knew when he pleaded guilty that he did not have to plead guilty and that he could have set his cases for trial. Petitioner denied that circuit court counsel discussed with him that his prior murder conviction would make him a Range II offender as to the Class B felony charges. He agreed that the charges that general sessions counsel represented him on were Class B felonies and that he was ultimately allowed to plead to reduced charges of Class C felonies as a Range I offender. Petitioner agreed that he knew what he was pleading guilty to and the length of his sentences when he pleaded guilty and that he signed the plea paperwork. He further agreed that he was able to speak to both of his attorneys before entering his guilty pleas.

Petitioner acknowledged that he was under oath when he entered his pleas and that, when the trial court questioned him about whether his pleas were his "free and voluntary decision," he answered affirmatively. The following exchange then took place:

Q.  All right.  And that you understood exactly what you were doing?

A.  Yes.

Q.  Understood the nature of the charges against you and you have made the decision to plead guilty free and voluntarily?

A.  Yes, that's what I said because that's what you have to do to get your guilty pleas accepted.

Q.  I think he even asked do you have any complaints about your representation and you said, no, you didn't have any complaints about --

A.  No.  I mean, I wanted to get the plea deal accepted in.

Q.  So what I think you're saying here today is when you answered the judge's questions, you weren't being truthful with him?

A.  No.  You're right.  I wasn't.

. . . .

- 13 -

Q. How many times do you think you lied under oath? How many of those questions do you think you were untruthful about?

A. Probably just the part where he asked me would I knowingly and willfully plead guilty.

The post-conviction court took the matter under advisement and later entered a written order denying relief. The post-conviction court found that Petitioner was "a middle aged, reasonably intelligent person with no obvious deficits" and that Petitioner had "previous contact with the criminal justice system and was convicted . . . of second-degree murder." The court concluded that Petitioner had failed to demonstrate by clear and convincing evidence any facts necessary to support his claim that he would have taken his cases to trial but for the ineffective assistance he received from counsel. Further, the court found that Petitioner "specifically stated he knew what his plea deal was and the length of his sentence and that he wanted to get that deal to protect his daughter." Regarding Petitioner's claims that counsel did not review discovery, including audio discs, with him, the court found that "Petitioner's credibility [was] suspect at best." The court concluded that Petitioner was not entitled to post-conviction relief.

This timely appeal follows.

## Analysis

On appeal, Petitioner contends that he is entitled to post-conviction relief because his guilty pleas were not voluntary. He contends that the guilty pleas were the result of coercion and pressure placed upon him by the State's conditioning of his daughter's plea deal upon his pleading guilty pursuant to the State's offer in his cases.[3] The State responds that Petitioner entered his guilty pleas freely and without coercion, and therefore, the post-conviction court properly denied relief. We agree with the State.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). As such, we review a post-conviction court's findings of fact under a de novo standard with a presumption that those findings are correct unless otherwise proven by a preponderance of the evidence. *Id*. (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). The post-conviction court's conclusions of law and application of the law to factual findings are

---

[3] In his petition for post-conviction relief, Petitioner also asserted that he was denied the effective assistance of counsel, but he abandoned this argument on appeal.

- 14 -

reviewed de novo with no presumption of correctness. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015).

When reviewing the post-conviction court's findings of fact, this court does not reweigh the evidence or "substitute [its] own inferences for those drawn by the [post-conviction] court." *Fields*, 40 S.W.3d at 456. Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Id*. (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457.

Whether a guilty plea is intelligent and voluntary is a mixed question of law and fact. *Jaco*, 120 S.W.3d at 830-31. Therefore, in such cases we review the post-conviction court's findings of fact de novo with a presumption of correctness. *Id*. The post-conviction court's findings of law are reviewed purely de novo. *Id*.

When reviewing a guilty plea, this court looks to both the federal standard as announced in the landmark case *Boykin v. Alabama*, 395 U.S. 238 (1969), and the state standard as announced in *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977), *superseded on other grounds by* Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). *Rodgers v. State*, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764, at *5 (Tenn. Crim. App. Apr. 26, 2012). Under the federal standard, there must be an affirmative showing that the plea was "intelligent and voluntary." *Boykin*, 395 U.S. at 242. Likewise, the Tennessee Supreme Court has held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea . . . ." *Mackey*, 553 S.W.2d at 340. "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Boykin*, 395 U.S. at 242-43).

In order to determine whether a plea is intelligent and voluntary, the trial court must "canvass[ ] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin*, 395 U.S. at 244. The trial court looks to several factors before accepting a plea, including:

> [T]he relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship*, 858 S.W.2d at 904; *Howell v. State*, 185 S.W.3d 319, 330-31 (Tenn. 2006). Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. *Boykin*, 395 U.S. at 244.

Statements made by a petitioner, his attorney, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). Statements made in open court carry a strong presumption of truth, and to overcome such presumption, a petitioner must present more than "conclusory allegations unsupported by specifics." *Id*. at 74.

Here, the *Blankenship* factors weigh heavily in favor of Petitioner's guilty pleas having been entered knowingly and voluntarily. *See Blankenship*, 858 S.W.2d at 904. Petitioner acknowledged at the plea submission hearing that he completed his GED, that he could read and write, and that he read and signed the plea paperwork. Moreover, general sessions counsel testified that Petitioner was "highly intelligent" and that he never had issues communicating with Petitioner. Additionally, Petitioner was clearly familiar with criminal proceedings, having been previously convicted of second-degree murder.

Petitioner was represented by two competent attorneys; he was fully advised by counsel about his charges and the plea deal, and he had the opportunity to confer with both counsel about the options available to him before entering his guilty pleas. General sessions counsel, who possessed fifty years' experience in the practice of law, testified that he discussed the State's plea offer with Petitioner and that he believed Petitioner's guilty pleas were voluntary. Circuit court counsel had eighteen years' experience in the practice of law and testified that he met with Petitioner four or five times prior to the entry of the guilty pleas. Circuit court counsel obtained discovery, spoke with Petitioner about the strengths and weaknesses of the State's case, and explained alternatives to pleading guilty, including proceeding to trial or pleading guilty with sentencing left open. Circuit court counsel said that Petitioner participated in the plea-bargaining process and opined that Petitioner fully understood the alternatives to pleading guilty. Additionally, at the plea submission hearing, the trial court fully advised Petitioner of the charges, including the elements of the crimes that the State would have to prove at trial, and the effect of his guilty pleas. Under oath, Petitioner stated that he understood the plea agreement, that he had discussed the facts of the cases with counsel, and that he was entering the guilty pleas voluntarily. In accepting the guilty pleas, the trial court found that the pleas were "entered knowingly, voluntarily, [and] intelligently[.]"

Regarding Petitioner's reasons for pleading guilty, circuit court counsel testified that Petitioner's "sole motivation was the fact that he had three Class B, which he's at least

Range [II] on, felonies that were mandatory consecutive to one another and what his current sentence was" and noted that Petitioner received "less than the minimum" sentence by accepting the State's plea offer. General sessions counsel testified that Petitioner had a "real serious problem . . . in front of a jury and sentencing thereafter" if he had not pleaded guilty. General sessions counsel testified that, although Petitioner was concerned about his daughter, Petitioner also believed his plea agreement was in his best interest. Petitioner claimed that he only pleaded guilty because he was not "going to be the daddy that sends my daughter to prison" and maintained that, if his daughter had not been "pleading out" the same day, he would have taken his cases to trial. However, the post-conviction court found Petitioner's testimony "suspect at best[,]" and we are bound by the credibility determinations of the post-conviction court. *See Fields*, 40 S.W.3d at 456. Based upon our review of the *Blankenship* factors, we conclude that Petitioner voluntarily entered his guilty pleas.

Nevertheless, Petitioner maintains that his guilty pleas were not voluntary and were the result of coercion because his daughter's plea deal was contingent on Petitioner accepting his plea offer. However, this court has consistently held that conditional, package plea offers are an acceptable plea-bargaining method and that such a contingency does not equate with a coerced guilty plea. *See, e.g.*, *Parham v. State*, 885 S.W.2d 375, 382 (Tenn. Crim. App. 1994) (stating that "[w]hen there are multiple defendants, the district attorney general may make an offer of settlement contingent upon all of the defendants accepting the offer and pleading guilty"); *Bryant v. State*, No. E2002-00907-CCA-R3-PC, 2004 WL 443414, at *11-12 (Tenn. Crim. App. Mar. 11, 2004), *perm. app. denied* (Tenn. Sept. 7, 2004) (compiling cases); *Daniel v. State*, No. E2002-02838-CCA-R3-PC, 2003 WL 22187067, at *9 (Tenn. Crim. App. Sept. 23, 2003) (stating that "one defendant may be motivated to enter into a plea agreement to secure leniency for another co-defendant without such motivation invalidating the otherwise voluntary nature of the plea"), *perm. app. denied* (Tenn. Dec. 22, 2003); *Sturgill v. State*, No. E2002-00385-CCA-R3-PC, 2003 WL 239743, at *4 (Tenn. Crim. App. Feb. 4, 2003) (stating that "[p]lea offers by the [S]tate may legitimately require that all codefendants agree before the offer is extended to any defendant, and such a contingency does not equate with a coerced guilty plea"), *perm. app. denied* (Tenn. June 30, 2003). Petitioner has failed to establish that his guilty pleas were involuntary. He is not entitled to relief.

## Conclusion

Based upon the foregoing, we affirm the judgment of the post-conviction court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE